## JAMES HEDDON'S SONS et al. v. RUSH et al.

### RUSH v. PALTZ.

(District Court, N. D. New York. April 14, 1921.)

Nos. 241, 254.

1. Patents ☞114—Complainant, suing for patent after priority was awarded to another, must produce new evidence.

    A complainant, suing for a decree adjudging him to be entitled to a patent for a design as to which priority had been awarded by the Court of Appeals of the District of Columbia to defendants, has a heavy burden to establish his right to relief, and cannot succeed unless the evidence shows to the satisfaction of the court that there is new or additional and convincing evidence that complainant, and not defendant, was the first inventor.

**2. Patents ⟐114—Evidence held to show patentee of design for wooden fish bait was not original inventor.**

In a suit to have complainants decreed to be entitled to a patent for a design for a wooden fish bait, issued to defendants, evidence *held* to show sufficiently by testimony not before the Court of Appeals of the District of Columbia in interference proceedings that complainants' predecessor in title was the original inventor of the design, and that defendants acquired knowledge of such design from him.

**3. Patents ⟐328—1,101,223, claim 5, for wooden fish bait, held not infringed, when construed to be valid.**

The Welles patent, No. 1,101,223, claim 5, for a wooden fish bait, when construed, as it must be, to be valid under the prior art, as limited to the specific construction shown, for the purpose of causing the bait to travel in a horizontal position and on a substantially straight path, *held* not infringed by a bait which traveled in an oblique position and a zigzag path.

**4. Patents ⟐328—1,101,223, claim 1, for wooden fish bait, held not valid or infringed.**

The Welles patent, No. 1,101,223, claim 1, for a wooden fish bait, the novelty in which was asserted to arise from the so-called throat, *held* not valid, in view of evidence that the throat performed no useful function, and, if valid, not infringed by a bait having no throat.

In Equity. Separate bills by James Heddon's Sons and another against Joseph K. Rush and another, to secure a decree that complainants were entitled to a design patent, and by Joseph K. Rush against Albert K. Paltz, doing business under the firm name of the W. A. Able Company, for the infringement of a patent. Decree for complainants in first suit, and for defendant in the second.

The first suit above entitled, No. 254, is brought by the complainants under section 4915 of the Revised Statutes (Comp. St. § 9460), the assignee of an application for a design patent of a fish bait, and which suit is based upon the claim that one Fillmore M. Smith, of Syracuse, N. Y., now deceased, was the first inventor thereof. The design patent, No. 46,794, granted to Joseph K. Rush on the alleged invention of one Leroy Yakeley, of Syracuse, N. Y., was placed in interference with the Smith application. The Examiner of Interferences decided in favor of Yakeley. The Board of Examiners in Chief and the Assistant Commissioner of Patents decided in favor of Smith, and the Court of Appeals, District of Columbia, decided in favor of Yakeley. Thereupon the bill of complaint in this suit, No. 254, was filed.

The defendant Rush counterclaimed, alleging infringement by the plaintiff of the Welles patent, No. 1,101,223, dated June 23, 1914, and of which he had become the owner. Rush brought suit in equity (Equity No. 241, the second case above entitled), charging infringement by the plaintiff of the said Welles patent. Paltz, defendant in the second action above entitled, No. 241, is the selling agent of James Heddon's Sons, complainant in the first action above entitled, No. 254.

These suits in equity by stipulation were tried together. The Welles patent shows a fish bait made of wood, with the front end cut away at an angle, so as to provide and present an inclined surface; so that, when drawn through the water, the bait will dive beneath the surface.

Donald F. McLennan, of Syracuse, N. Y. (W. Clyde Jones, of Chicago, Ill., C. W. Hendryx, of Dowagiac, Mich., and Leroy B. Williams, of Syracuse, N. Y., of counsel), for plaintiffs in first and defendant in second suit.

⟐For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Howard P. Denison and Eugene A. Thompson, both of Syracuse, N. Y. (Stewart F. Hancock, of Syracuse, N. Y., of counsel), for defendants in first and complainant in second suit.

RAY, District Judge. [1] The Court of Appeals of the District of Columbia having decided in favor of Yakeley, and the suit No. 254 having been brought to secure the grant of a patent on the theory that Smith was the first inventor, a heavy burden was thrown upon the complainant James Heddon's Sons and its associate complainant. In short, the complainants in that suit are not entitled to succeed, unless the evidence is such as to establish to the satisfaction of the court that there is new or additional and convincing evidence that Smith and not Yakeley was the first inventor.

[2] The trial of these actions occupied several weeks, and quite a number of witnesses were sworn in open court, and the court had the benefit of hearing them testify and noting their appearance, etc. Certain depositions and evidence taken in interference and other proceedings were put in evidence, so that the court has before it a voluminous and somewhat intricate record. The case calls upon the court to decide the question of fact whether Yakeley or Smith was the first inventor, and the correct decision of this question of fact has called for a careful examination of the evidence in the case.

In view of the prior art, especially the Welles patent, there was no invention in producing a diving wooden fish bait; that is, one which, when drawn through the water, would dive beneath the surface and zig-zag more or less as drawn along, thus giving to it, it is claimed, the motion of a fish moving through the water. It cannot be denied that, with the Welles patent in the prior art, Yakeley and Smith and others worked upon a wooden fish bait with the object and purpose of improving on the Welles bait. I think the proofs in the case establish that Smith conceived the design in the fall of 1913, and experimented with the bait during that fall and the following winter, and that he perfected his design in the spring of 1914, and sold specimens of his bait to various fishermen during that spring and the following summer. This improved fish bait was reduced to practice by Smith in the fall of 1913, and professional fishermen at Sandy Pond or that vicinity gained knowledge of this bait through Smith in the spring of 1914, and Smith sold specimens of the bait to other fishermen, so that public use in the spring of 1914 is established. Dealers in and salesmen of fishing tackle at Syracuse, N. Y., acquired knowledge of this new bait through Smith in the early spring and summer of 1914.

The testimony of the witnesses who corroborate Smith in these regards seems to be disinterested and credible. Attorneys and court officials, who had and have no interest in the matter, and who were and are expert in fishing, testified that they first gained knowledge of this particular type of bait through Smith in the spring and summer of 1914. I think the evidence establishes beyond question that Smith conceived and reduced to practice the design in issue in the fall of 1913, and that there was public use and sale of the same in the spring of 1914, and that

Yakeley and those succeeding to his rights, if any, have failed to establish that he (Yakeley) was an independent prior inventor. Yakeley testified that he conceived this invention in the spring of 1913, and that he had samples of the bait turned at the factory of one Lyons, in the city of Syracuse, early in June, 1913, and that Lyons' factory turned a quantity of the bait in July and August, 1913, and also that he (Yakeley) and certain companions of his fished with some of these baits at Sandy Pond in the month of August, 1913.

In the design interference proceedings it was contended on the part of Yakeley that the bait was used openly and publicly at Sandy Pond, and it was claimed that Smith acquired his knowledge of the bait from Yakeley's use thereof at Sandy Pond in August, 1913. There can be no doubt that both Yakeley and Smith were at Sandy Pond in the month of August, 1913; but there is no evidence of any sale or public use by Yakeley until August, 1914, which was a year later. There was and is a sharp conflict in the evidence as to whether certain events took place in 1913, or a year later, in 1914. I think the evidence establishes, and I was satisfied on the trial, that Yakeley and his witnesses had placed and were placing certain important events in 1913, when they actually occurred a year later; that is, in 1914.

Mr. Lyons exhibited considerable bias as a witness, and the evidence establishes that he was mistaken in certain important matters. Sworn as a witness, he was disinclined to produce his books and papers, and, taking his evidence as a whole in connection with the other testimony, it appears certain that he was mistaken in several important matters. His testimony given on the trial differs to quite an extent from that given in the interference proceedings had in the Patent Office. In the interference proceedings Mr. Lyons testified that an order for 1,000 baits received in 1913 were for Yakeley baits, and on this statement Mr. Lyons based his claim that the Yakeley bait was devised in 1913. The testimony on the trial showed, and establishes to my satisfaction, that the order to which Mr. Lyons referred was for 1,000 Welles baits, and not for the Yakeley baits, and that such order was received by Lyons in 1914, instead of 1913, as claimed by Lyons. On the trial the ledger sheet of the Lyons factory was finally produced, and shows an order of 65 cents on June 6, 1914. This sheet was not before the Patent Office or the Supreme Court, District of Columbia, and is quite persuasive evidence in favor of complainants' contention that the first baits turned at the Lyons factory for Yakeley were turned early in June, 1914, and not in June, 1913. I think Lyons and Yakeley were mistaken in testifying that there was a verbal order for 1,000 baits given by Yakeley to Lyons in 1913.

It was claimed that a trip to Shackleton's Point was made in June, 1913, before the opening of the bass fishing season. Mr. Yakeley and his witnesses testified and agreed that the trip to Shackleton's Point was made on a day during which there was considerable and quite frequent rain, and that they stopped fishing because of the rain. It was agreed by the witnesses that this trip was made on a Thursday in the early days of June, and prior to the 16th, on which day the bass season opened.

Weather Bureau reports put in evidence showed that the Thursdays in 1913 were bright, clear, sunshiny days, but that one of the Thursdays in 1914, June 12, was a rainy day, and, taking the evidence as a whole, I think it establishes that this trip to Shackleton's Point was in 1914, and not in 1913. The evidence establishes to my satisfaction that Mr. Yakeley acquired his knowledge of this invention from Smith, and that he so gained same in the spring and summer of 1914.

One of the credible witnesses testifies that in the spring of 1914 Smith exhibited to him the new bait, and that shortly afterwards he (the witness) described this new bait to Yakeley, and suggested to Yakeley, who was skilled in enameling, that he enamel the baits for Smith. Later that season Yakeley exhibited one of the Smith baits to this witness, and the witness said to him, "That is Fillmore Smith's plug." Yakeley said to the witness that he was getting ready to place the bait on the market; that Smith could not put them on the market, and that he (Yakeley) proposed to do so. Another witness testified that Yakeley offered the Smith style or type of bait for sale at the store where he was employed in the summer of 1914. This witness, who had seen the Smith bait, and knew of Smith's designing or invention of same, said to Yakeley, "That is Fillmore Smith's bait;" whereupon Yakeley said that he (Yakeley) had made arrangements to make and put these baits on sale. Three or four witnesses testified to conversations with Yakeley, in which they spoke of the bait as Fillmore Smith's bait, and Yakeley made no claim that he (Yakeley), and not Smith, was the inventor thereof. In short, I think the evidence shows that Yakeley recognized the fact, and impliedly admitted, that Smith was the inventor. Smith was a man of good character and entitled to credit, and the witnesses referred to, who testify to these conversations with Yakeley, are men of good character and to whose testimony credit should be given. They had no reason or interest to testify falsely, and there is nothing in the evidence in the case to indicate that they were mistaken.

Mr. Smith was in charge of the local office of the Society for the Prevention of Cruelty to Children, and is corroborated in his testimony by the testimony of two office assistants, both women, who were disinterested. One of these remembers that Yakeley came to Smith with the box containing 20 of the Smith baits, which had been enameled by Yakeley, each of which baits was wrapped in white tissue paper. Both of these witnesses identified the baits as the Smith baits that Yakeley had enameled. In the Patent Office proceeding Yakeley testified that he did not remember enameling any wooden baits for Smith, while at the trial he testified that he distinctly remembered enameling metallic spoons, and that it was enameled spoons, not wooden baits, that he enameled. The testimony of Yakeley is at variance with his testimony in the Patent Office interference and directly in conflict with the testimony of the two office assistants of Smith. In the interference proceedings Yakeley testified that the first bait which he made involving the issue was whittled by him with a knife from a piece of wood, while at the trial he testified that he made the first bait by taking an old Welles bait and whittling off an annular projection or ridge. The Welles bait

had been made by turning, and Yakeley testifies that it was delivered to him by Welles. These statements, made by Yakeley as to the making of the first bait, involving the issue, do not agree.

One witness testifies that he worked with Yakeley in working out the bait in evidence and marked "Exhibit 1–C." This bait does not involve the design of the issue, but has a piece of tin extending obliquely from the tip end of the bait to form a diving plane. This witness testifies to his discussion of this type of bait with Yakeley, and that later on Yakeley brought to the store and placed on sale a half dozen of the baits like Exhibit 1–C. This witness produced an account book, which shows that these baits were placed on sale for Yakeley June 30, 1913. None of these baits left at the store, 1–C, were sold, and demonstrations made at the trial showed that this bait was not successfully operative. If Yakeley had, as he claims, the design in controversy in the early part of June, 1913, and if he had demonstrated its success by use at Shackleton's Point prior to the middle of June, 1913, it seems very improbable that he would have been working in June, 1913, on this inferior form of bait embodied in Exhibit 1–C and in placing the same on sale in the latter part of the month of June, 1913.

The defendant Joseph K. Rush claims that he purchased the Yakeley invention. In August, 1914, he made a contract regarding the bait in issue. In the proceedings in the Patent Office both Rush and Yakeley testified in substance that Yakeley had parted with all interest in the invention, and had reserved no interest, right, or title of any kind, and had not received and did not intend to receive any payment of money as royalties or otherwise under or by reason of the contract and the transfer of Yakeley's rights. Rush and Yakeley refused to produce this contract during the interference proceedings, but it was produced upon subpœna at the trial. The account books of Rush showed that Yakeley had been paid under the contract $40,000 at the time of the trial. By the terms of the contract Rush sold the baits and Yakeley made them—the baits of the design in controversy. Rush had knowledge of Smith's bait, and had fished with it at Sandy Pond in the spring of 1914. He had his picture taken with a string of fish caught with one of the Smith baits. The Smith bait is shown in the picture in evidence. Rush acquired his interest in the alleged Yakeley invention, with a full knowledge of Smith's accomplishments in the spring of 1914.

It is impossible, of course, without using too much time and space, to go through with and analyze all the proofs and testimony; but, taking it altogether, I find new and persuasive proofs, which were not before the court of the District of Columbia in the design interference. I find that Yakeley was not an independent inventor of the design in issue, but that he derived his knowledge of the invention from Smith, and the finding should be and is that Smith, and not Yakeley, was the first inventor of the design in issue.

[3] The Welles patent shows a fish bait made of wood, with the front end cut away at an angle to provide an inclined diving surface. This inclined surface forces the bait, when drawn through the water beneath the surface, as has already been stated. Welles was looking

for a form of bait which would move in a straight line and occupy a horizontal position when diving, and he undertook to secure this horizontal movement by placing a boss at the rear end of the bait with an inclined forward surface. The pressure of the water against this inclined surface would tend to keep the tail or rear end of the bait depressed, so that the body of the bait would be horizontal in traveling through the water. The straight line movement he proposed to secure by providing a channel lengthwise of the boss. He also proposed a so-called throat beneath the bait near the forward end, to assist in keeping the body of the bait horizontal when drawn through the water. The proofs and the demonstrations made before the court showed that the Welles bait acts the same, whether this so-called throat be present or absent. I do not see that the throat performs any practical or serviceable function.

The Tad-Polly bait, which is charged to infringe, has a body of substantially cigar-shaped formation and a head or nose, so called, which inclines downwardly and is ellipsoidal in shape when viewed from the front. This inclined head or nose forms the diving surface to cause the submersion of the bait when drawn through the water. There is also a narrow or restricted neck, which joins the cigar-shaped body to the inclined head or nose. The testimony and the demonstrations made at the trial show and showed that the Tad-Polly bait, when drawn through the water, travels with the body in an oblique position, with the tail inclined upwardly; the body standing at an angle. The body zigzags back and forth laterally, with a motion which is quite uniform, and it is claimed simulates the swimming movement of a minnow. I think there is a distinct difference in the mode of operation of the Welles bait and the Tad-Polly bait. The Welles bait has special means to bring about the horizontal position of the body when diving, and a movement in substantially a straight line, while the Tad-Polly bait moves through the water with its body oblique, and, instead of moving in more or less of a straight line, has a distinctive and regular lateral zigzagging motion.

Oblique diving planes at the forward ends of wooden baits are old in this art. The Rhodes patent, the Heddon "900 bait," and the Wilbur and Ball patent are instances. This inclined diving plane is shown, also, in the Stewart, Bowersox, Alger, and Lockhart patents of the prior art. The Rhodes patent is one of the earliest patents in this art, and shows an oblique diving plane of metal attached at the forward end, to aid, at least, in causing the bait to submerge. Demonstrations with this bait in open court showed that it would travel substantially in a straight line, with the body horizontal. The Heddon "900 bait" has been on the market since 1909, and the forward end is cut away at an angle, evidently to provide a diving surface. The Wilbur and Ball patent shows a bait of conical formation, with the forward or larger end cut away obliquely, and demonstrations at the trial showed that it would dive with the body occupying a somewhat oblique position, and that the bait, when drawn through the water, would have a laterally wavy motion.

The testimony of Wilbur and Ball was to the effect that they first

made baits of the type shown in the patent in 1911. Their evidence on this subject is corroborated. Thirteen disinterested witnesses testified to the successful use, reduction to practice, and testing of the bait during 1911. I think the evidence is overwhelming, from credible witnesses, that the Wilbur and Ball invention was prior to the invention of the Welles bait. Claim 5 is anticipated by the prior art, unless this claim is narrowly and strictly construed, to contemplate and include the special means provided by Welles to keep the body of the bait horizontal, and to cause the same to travel in more or less of a straight line. Giving to these patents and claims a proper construction, it does not seem to me that infringement is made out.

[4] It is asserted that the novelty of claim 1 resides in the employment of the so-called throat. Claim 1 of the patent cannot be sustained, as the proofs given and the demonstrations made at the trial show that the so-called throat does not perform the function claimed for it in the patent. The bait operates and performs the same, whether the throat be present or absent; but, conceding that the throat performs the function alleged—the keeping of the body in a horizontal position—this claim is not infringed by the Tad-Polly bait, inasmuch as the body occupies an oblique position when diving.

I think the counterclaim and bill of complaint filed in the second above-entitled action should be dismissed for want of equity, and that in the first suit above entitled, as already stated, priority of invention must be awarded to Smith.

There will be a decree accordingly.